## MISSOURI, K. & T. RY. CO. OF TEXAS v. POPE.

(Court of Civil Appeals of Texas. Dallas. June 29, 1912. Rehearing Denied Oct. 12, 1912.)

**1. APPEAL AND ERROR (§ 745*)—ASSIGNMENT OF ERROR—FILING.**

Where an assignment of error is not filed in the court below, nor its filing waived by opposing counsel, and where the brief of the party taking the assignment contains no certificate by the clerk of the trial court that the brief was filed therein, the assignment cannot be considered.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3039, 3042; Dec. Dig. § 745.*]

**2. CARRIERS (§ 244*)—WHO ARE PASSENGERS —PERSONS CARRIED BEYOND THEIR DESTINATION.**

Plaintiff, aged 15, and her niece, aged 5, while traveling, fell asleep and were carried past their destination, at which the train had made its usual stop, and not discovered and awaked until eight miles beyond, when the conductor suggested that he would assume charge of them and take them to the end of his division to a house of good repute where he stayed, and return them the next day to their destination. *Held*, in an action against the railroad for damages based on the conductor's suggestion, that at the time he made it he was acting within the apparent scope of his authority, so as to confer upon plaintiff the rights of a passenger.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1115, 1116; Dec. Dig. § 244.*]

**3. CARRIERS (§ 283*)—PERSONAL INJURIES— ACTS OF EMPLOYÉS—INSULTING LANGUAGE.**

Plaintiff, aged 15, with her niece, aged 5, fell asleep and were carried past their destination, and not discovered and awaked until eight miles beyond, by the auditor, coming for their tickets, when the conductor told her that it was all right; that she should not worry; that he would see that she got back to Ft. Worth on his train the next morning; that he would take her to a house of good reputation where he stayed—the evidence failing to show that the offer was made in any other than a polite, respectful manner, unaccompanied by any act or insinuation importing a concealed motive to shame or humiliate plaintiff. *Held*, in an action for damages based on the suggestion made by the conductor, that his language was not insulting, and hence not actionable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1119–1124, 1140, 1141; Dec. Dig. § 283.*]

**4. CARRIERS (§ 283*)—PERSONAL INJURIES— ACTION OF EMPLOYÉS—SCOPE OF AUTHORITY.**

Defendant's conductor discovered plaintiff, aged 15, and her niece, aged 5, asleep about eight miles beyond their destination, and told them that it was all right; that they should not worry, and that he would see that they got back to their destination on his train the next morning; that he would take them to a house of good reputation where he stayed, and, on arriving at the end of his division, took them to a restaurant and then to the house where he stayed, which was a house of bad reputation, from which plaintiff was shortly after removed and suffered mental pain. *Held*, in an action for damages, that the conductor, after leaving the train at the end of his division, was acting in his personal capacity, and not in his employer's business; and hence that the company was not liable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1119–1124, 1140, 1141; Dec. Dig. § 283.*]

**5. CARRIERS (§ 319*)—PERSONAL INJURIES— ACTS OF EMPLOYÉS—INSULTING LANGUAGE —UNDISCLOSED INTENTION.**

Where language of a conductor towards a female passenger is not in itself insulting or actionable, there can be no recovery for mental damages on the theory that his undisclosed intention was to insult the passenger.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1340, 1342, 1344; Dec. Dig. § 319.*]

Appeal from District Court, Hill County; C. M. Smithdeal, Judge.

Action by Aline Pope, by next friend, against the Missouri, Kansas & Texas Railway Company of Texas. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Alexander S. Coke, of Dallas, and Ramsey & Odell, of Cleburne, for appellant. Collins & Cummings, of Hillsboro, for appellee.

RASBURY, J. [1] Appellee, by cross-assignment, raises the preliminary question that the statement of facts in this case was not filed in the manner and time provided by law. Appellant objects to a consideration of the assignment, on the ground that it was not filed in the court below nor its filing waived by opposing counsel; nor does appellee's brief contain a certificate by the clerk of the trial court that the brief was filed in the trial court. The record sustains the objection of appellant, and it is our duty, under the rules and decisions, to sustain the objection. Patterson v. Seeton, 19 Tex. Civ. App. 430, 47 S. W. 732; Morrow v. Terrell, 21 Tex. Civ. App. 28, 50 S. W. 734; Scott v. Marlin, 25 Tex. Civ. App. 353, 60 S. W. 969.

Appellee, a girl about 15 years of age, by her mother as next friend sued appellant in the district court of Hill county for damages for alleged misconduct of its conductor toward appellee while she was a passenger upon appellant's train. Appellee was traveling from McAlester, Okl., to Ft. Worth, Tex., accompanied by her little 5 year old niece. Before the train reached Ft. Worth, the children fell asleep, and continued asleep until the train reached Ft. Worth, made its usual stop, and resumed its journey south to Hillsboro. The train officials were unaware that the children had been carried past their destination; nor did the children awake until aroused by the train auditor at a point about eight miles out of Ft. Worth, for the purpose of taking up their tickets. When it was discovered that the children had been carried past their station, it was finally suggested by appellant's conductor that he would assume charge of the children when he reached Hillsboro, the end of his division, and, in the words of appellee, "would take me to Hillsboro and take me to a house of good reputation, to a nice house where he stayed," and return with them the following morning, at which time he again resumed his duties as conduc-

tor, to their original destination, Ft. Worth. When the train reached Hillsboro, appellee and her niece, escorted by appellant's conductor, went to a restaurant for food, from which place appellee telephoned her brother at Ft. Worth her situation, advising him that she was in charge of the conductor and would return home the following morning. The conductor afterwards escorted the children to the boarding house of a Mrs. Casey, where the conductor had been stopping for a number of years, explained the situation to Mrs. Casey, and asked for a room for the children. The room was furnished, the children retired, and, at the suggestion of Mrs. Casey, locked themselves in. What transpired afterwards is best told by appellee, who testified as follows:

"From the time we got to the house until we left, we hadn't been disturbed in any way. It was about 2 o'clock, I think, when the officers came down there. During the time I was there, I had no time to see anything improper or wrong in any way; but, regardless of time, I saw absolutely nothing wrong or improper in any way. Mrs. Casey and the conductor were both very courteous to me. At about 2 o'clock, when the officers came there, it is a fact that I was in bed sleeping so soundly that they had some difficulty in waking me up, and I didn't know anything about them trying to wake me up until Mrs. Casey finally had to come around to the window and raise it. I did not even know that one of the officers had taken a flashlight and flashed it on the bed where I was sleeping. After the officers came there, then it was that I got up and dressed and left the place. I do not know the names of those officers. I was taken to the sheriff's office in the courthouse. I did not stay there any longer than it took to phone. I don't know exactly how long it was, about 15 minutes, I guess. I was then taken to another hotel or boarding house, and went back to Ft. Worth on the train next morning. After getting on the train next morning, I had a conversation with the conductor, and he asked me why I was taken away, and I told him I didn't know; and he said he had been stopping there for 20 years, and it was a nice place, so far as he knew. I went on the same train with the conductor to Ft. Worth, and when the train reached Ft. Worth the conductor came and assisted me off the train, and we started to the depot. He did not ask me what car I would take to get home, but he did take my grip and start to the depot; and on the way to the depot we met my brother coming down, and my brother had a conversation with the conductor about the matter while I was present. It is a fact that, except for having learned as I had of this house having a bad reputation, this conductor treated me with every courtesy any gentleman could all the time I was with him on the train and until I got back to Ft. Worth.

There was absolutely no improper suggestion or conduct toward me any time I was in his car or charge. He told me that down at this house where he took me there were two little girls about my age. When I testified before, I don't know whether I testified that my feelings were hurt, or that I was insulted by what the conductor said to me while I was on the train. It was what the conductor said to me on the train, and the fact that he had taken me to a place of bad reputation, that hurt my feelings. It was both of them. I testified on a former trial that one of the things that hurt my feelings was the fact that he had taken me to a place of bad reputation. I don't think I testified anything else hurt my feelings. On the former trial I didn't testify to anything like that, because I wasn't asked."

Appellee's suit was based on the proposal of the conductor, made upon the train, to take appellee to a house that bore the general reputation of a house where lewd women resorted, and that such suggestion was an insult and entitled appellee to recover damages from appellant for the mental pain she suffered when she subsequently learned the character of the house. A trial was had, and appellee was awarded a verdict for $4,000 damages.

[2] Appellant, by appropriate assignment of error, urges that the testimony is insufficient to sustain the claim that appellee was a passenger upon appellant's train at the time the conductor proposed to appellee that she spend the night at the alleged assignation house, and complains of the action of the court in submitting that issue to the jury. On this point appellant's conductor testified: "I was sitting in the head car when my attention was first called to these girls by two gentlemen. They came to me and told me they had a little trouble and wanted me to help them out, and I asked them what was the matter, and they said there was two little girls that had been carried by Ft. Worth, and that they had lost their pocketbook and had no money, and that they had made up a little purse, $2.50, and had given it to them. And I says, 'What do you want me to do?' and they said they wanted me to take charge of the girls and see that they got back, and I told them I would, and I asked them where the girls were, and they said they were sitting in the chair car; and I went back and asked the girls how come them to get carried by Ft. Worth, and I told them we were there half an hour; and they said they had been on the road about four days and were sleepy and had fell asleep, and I asked them if they had notified any of the crew that they were sleepy, and they said, 'No.' I asked them how come they to be on the road alone four days, and the young lady said the little girl's father was an engineer on the Rock Island Road, and had got passes for her mother and the little girl's mother, and had failed to get

one for them; and that in buying the tickets for the children he had got them routed wrong from McAlester, Okl., over the Katy instead of the Rock Island; and I asked her what time she thought her mother would be in, and she said some time to-morrow morning, and I told her not to worry; that I would see that she would be taken care of, and for her to stay there until we got to Hillsboro."

Based upon this and other testimony in the record we think there was no error in submitting the question to the jury, inasmuch as we are of opinion that the arrangement made by the conductor, as detailed above, with appellee and her niece, with respect to their transportation to and from Hillsboro, is within the apparent scope of the conductor's authority and would be binding upon the company and confer upon appellee and her niece the rights of passengers. It has, in effect, been so decided by this court. St. Louis S. W. R. Co. v. Fowler, 93, S. W. 484.

Various errors are assigned, attacking the court's charge, and we are of opinion, after a careful consideration of the same, that some of the assignments are well taken.

[3] By the fifth paragraph thereof the jury is directed that in estimating the damages accruing to appellee they may take into consideration any mental pain suffered by her, which would include any humiliation, shame, or disgrace consequent upon and proximately caused by the *language* of the conductor while upon defendant's train. Assuming that appellee's testimony correctly states what the conductor said to her on the train, his language does not warrant the charge of the court. Appellee testified, in substance, that the conductor told her it was all right, for her not to worry; that he would see that she got back to Ft. Worth on his train the following morning; that he would take her to a house of good reputation, to a nice house where he stayed. Surveyed from every possible angle, this language imports nothing that would wound the sensibilities or shame the morals of the most pure and virtuous. The evidence fails to show that the offer was made in other than a polite and respectful manner, unaccompanied by any act, innuendo, or insinuation that might import a concealed motive or intention by which it is fairly deducible that any shame or humiliation resulted. Literally and actually the language was not insulting; and it was erroneous to charge the jury that it might award appellee damages for shame and humiliation suffered by the utterance of words not actionable.

[4] And believing as we do that the language of appellant's conductor was in no respect actionable and, as a consequence, not the proximate cause of the alleged injury, it follows as a corollary that appellant cannot be held liable in damages for any mental pain suffered by appellee and caused by the act of appellant's conductor in directing her to a disreputable place, since the undisputed evidence shows that the conductor was acting in a matter wholly disconnected from the course of his employment. It is not denied —on the contrary, our courts have been quick to hold—that passengers, as such, are entitled to receive from the carrier and its servants the utmost protection and every precaution is required that can be exercised in that behalf, including the most respectful treatment. In the case at bar, however, it seems quite clear that Farnsworth, the conductor, was acting in his personal capacity, and was in no sense engaged in his master's business. The offer to care for appellee over night, pending her return the following morning, and to conduct her to a place where she could spend the night, was purely voluntary, and whether made from the purest or basest motives was his personal act, and any liability arising therefrom is personal to him. The appellee's testimony makes it clear that the shame and humiliation she experienced was brought about by reason of the reputation borne by the place where she spent the night, and not from any act or language of the conductor done or said while in the performance of his master's business. Appellee had left appellant's train and depot. The conductor had likewise quit his master's business; and hence, under such a state of facts, appellant owed the appellee no duty, and was not in law bound for the misconduct of its conductor. Our Supreme Court quotes approvingly from Bryant v. Rich, 106 Mass. 188, 8 Am. Rep. 311, the following: "As a general rule, the master is liable for what his servant does in the course of his employment; but in regard to matters wholly disconnected from the service to be rendered, the master is under no responsibility for what the servant does or neglects to do. The reason is that in respect to such matters he is not a servant." Railway Co. v. Dean, 98 Tex. 520, 85 S. W. 1135.

[5] Counsel for appellee urges that appellant is liable for the act of the conductor on the theory that, while the language of the conductor may not have been insulting, yet it should be held to be, for the reason that it was the undisclosed intention of the conductor to invite appellee to spend the night at a house of unsavory reputation, which was an insult; and that hence such language was the proximate cause of her injury. We think the proposition unsound. To permit a recovery for the use of language to a passenger which by no process of reasoning can convey insult or offense, on the theory that hidden in the mind of the speaker is a purpose to insult, would be to establish a rule, as applied to a principal, both indefensible and unjust. We speak, of course, from the standpoint of the principal without reference

to the acts of others or of the unfortunate plight of the appellee.

Holding the views we do as to the proximate cause of appellee's injuries it follows that the testimony was insufficient to support a verdict against appellant, and it becomes our duty to reverse the judgment of the trial court and here render judgment for appellant, which is accordingly directed, and which renders unnecessary the consideration of other assignments of error.

Reversed and rendered.